2009 UT App 179

Kenneth L. **FAILOR;** Premium Plastics, Inc.; and Mary Gilmer, Plaintiffs, Counterclaim Defendants, and Appellants,

v.

**MEGADYNE MEDICAL PRODUCTS, INC.,** fka American Medical Products, Inc., Defendant, Counterclaimant, and Appellee.

No. 20080459–CA.

Court of Appeals of Utah.

July 2, 2009.

---

Dale F. Gardiner, Cassie J. Medura, Scott M. Lilja, and Lisa B. Bohman, Salt Lake City, for Appellants.

George M. Haley, David R. Parkinson, and J. Andrew Sjoblom, Salt Lake City, for Appellee.

Before Judges BENCH, ORME, and DAVIS.

## OPINION

BENCH, Judge:

¶ 1 Kenneth L. Failor; Premium Plastics, Inc.; and Mary Gilmer (collectively, Plaintiffs) bring this interlocutory appeal to challenge the trial court's (1) grant of MegaDyne Medical Products, Inc.'s (MegaDyne) motion to strike Plaintiffs' jury demand, (2) denial of Plaintiffs' objections to the special master's report, and (3) denial of Plaintiffs' motion to amend their complaint. We affirm.

## BACKGROUND

¶ 2 This case arises from a dispute over payments due under a series of agreements between MegaDyne and Plaintiffs. Mega-Dyne manufactures electrosurgical blades that are coated with a patented nonstick surface. On behalf of MegaDyne's corporate predecessor, Kenneth L. Failor developed a prototype two-step coating process for applying the nonstick coating to medical instruments. In 1986, Mr. Failor engaged Mary Gilmer's husband, Harvey Van Epps Gilmer,[1] and his company, Premium Plastics, Inc. (PPI), to begin large-scale production of medical instruments coated through this two-step process. Given the improvements they made to the coating technology, Mr. Gilmer and PPI also developed trade secrets regarding the manufacturing process for coating these medical instruments.

¶ 3 In 1988, Mr. Failor signed an agreement with MegaDyne under which Mr. Failor would be paid a certain amount per unit of specified products sold to MegaDyne customers.[2] That same year, PPI entered into an agreement with MegaDyne under which PPI would coat certain MegaDyne products. PPI's agreement with MegaDyne was subsequently modified to provide that Mr. Gilmer would be compensated $.06 per unit for all products coated with a nonstick coating by MegaDyne.[3] That agreement was modified once more to further provide that Megadyne would pay PPI $.06 for products coated through September 1997 but that beginning in October 1997 MegaDyne would pay PPI $.06 for coated products that were actually sold.

¶ 4 From time to time, Mr. Failor and Mr. Gilmer complained about the accuracy of the payments made by MegaDyne, and they became concerned that MegaDyne was not paying the entirety of the monies owed to them. Unable to resolve the perceived disparities amicably, Plaintiffs filed suit in 1998. In their complaint, Plaintiffs asserted five causes of action: (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3) unjust enrichment, (4) accounting, and (5) negligent misrepresentation.

---

1. Mr. Gilmer passed away in 2006, and on July 21, 2006, his wife filed a motion to be substituted for Mr. Gilmer in this suit. The motion was unopposed, but it does not appear to have been granted by the trial court. We assume the propriety of Mrs. Gilmer's status in this appeal.

2. The contract provided that Mr. Failor would be paid $.08 per unit for the first three years, $.07 per unit for the fourth year, $.06 per unit for the fifth year, and $.05 per unit for the remaining years.

3. The modification was prompted by Mr. Gilmer's sale of PPI and MegaDyne's decision to take the coating process in-house.

Each of these claims addressed Megadyne's alleged failure to pay Plaintiffs the amounts due under the various contracts.

¶ 5 Shortly after filing their complaint, Plaintiffs filed a motion to appoint a special master.[4] Citing the complexity of the issues involved, Plaintiffs requested "an independent auditor to determine the amounts of products coated and coated products sold" and indicated that "[t]hereafter the Court will be able to easily determine the amount of compensation owed by [Megadyne] to Plaintiffs." Megadyne consented to the appointment, and the parties mutually agreed that John W. Curran should serve as the special master.

¶ 6 The trial court granted Plaintiffs' motion for a special master and entered the Order of Reference prepared by Plaintiffs. The Order of Reference defined the issues that had been referred to the special master and outlined the special master's compensation, duties, powers, and procedure. The special master began his work in April 1999, and he filed his final report with the trial court on August 3, 2000. In the final report, the special master concluded that Megadyne had overpaid Mr. Failor and Mr. Gilmer by $66,525.60 and $20,298.42, respectively.

¶ 7 After receiving the special master's final report, MegaDyne submitted a motion to strike Plaintiffs' jury demand and for judgment on the report. The trial court took the motion under advisement but did not immediately issue a ruling. In fact, approximately seven years lapsed without resolution of this and other motions. In October 2007, the parties filed supplemental memoranda regarding MegaDyne's motion as well as Plaintiffs' unresolved motion for an evidentiary hearing on the special master's report and Plaintiffs' objections to the report. Thereafter, Plaintiffs sought leave to amend their complaint to add a claim for an alleged violation of the Uniform Trade Secret Act.

¶ 8 In May 2008, the trial court issued an order striking Plaintiffs' jury demand, over-

ruling Plaintiffs' objections to the procedures utilized by the special master, and granting Plaintiffs' request for an evidentiary hearing. The trial court reasoned that Plaintiffs had, in essence, brought only an equitable claim for an accounting for which Plaintiffs had no entitlement to a jury trial. The trial court also refused to allow Plaintiffs to amend their complaint, citing the ten-year passage of time after the action was initiated. Before the trial court conducted an evidentiary hearing on the special master's report, Plaintiffs filed a request for leave to file an interlocutory appeal, which we granted.

## ISSUES AND STANDARDS OF REVIEW

■■■ ¶ 9 Plaintiffs claim that the trial court erred by granting MegaDyne's motion to strike their jury demand, and they assert that they are entitled to a jury trial on the legal claims pleaded in their complaint.

> Whether there is a right to a jury trial is a question of law that we review for correctness. However, [i]t is the prerogative of the judge who actually tries the case to make the determination of whether an issue is one in equity or one in law wherein the party can insist on a jury as a matter of right. Thus, [u]nless it is shown that the ruling [determining the equitable or legal nature of the issue] was patently in error or an abuse of discretion, this court will not interfere with the ruling thereon.

*Kenny v. Rich*, 2008 UT App 209, ¶ 21, 186 P.3d 989 (alterations in original) (citations and internal quotation marks omitted), *cert. denied*, 199 P.3d 970 (Utah 2008), *cert. denied*, —— U.S. ——, 129 S.Ct. 1628, 173 L.Ed.2d 997 (2009).

■■ ¶ 10 Plaintiffs next assert that the trial court erred by denying their objections to the procedures used by the special master and that the trial court should sustain their objections to the substance of the special master's report. We review "whether [a] special master proceeded properly in carrying out his duties" for correctness. *Plumb v.*

---

4. Plaintiffs initially sued for amounts earned but unpaid prior to July 31, 1998, and the special master was appointed to address issues relating to those disputed amounts. Plaintiffs subsequently brought suit for monies due and owing after July 31, 1998. Although the two suits were later consolidated, the special master's report covers only the time period prior to July 31, 1998.

*State,* 809 P.2d 734, 741 (Utah 1990). "If we find error in any respect, we must vacate the [court] order unless the error was harmless." *Id.*

¶ 11 Finally, Plaintiffs contend that the trial court erred in denying their motion to amend on the ground that the case was ten years old. "The standard of review of a denial to amend pleadings is abuse of discretion." *Kasco Servs. Corp. v. Benson,* 831 P.2d 86, 92 (Utah 1992).

## ANALYSIS

### I. Jury Demand

¶ 12 Plaintiffs first claim that the trial court erred in striking their jury demand because they retained a right to a jury trial on their legal claims asserted against MegaDyne. "The distinction between issues triable at law and those triable in equity serves to delineate the scope of the right to a jury trial under our case law." *Zions First Nat'l Bank v. Rocky Mountain Irrigation, Inc.,* 795 P.2d 658, 661 (Utah 1990). Utah courts have "made it clear that [the] constitutional right to a jury trial in civil cases extends only to cases that would have been cognizable at law at the time the constitution was adopted." *Id.* "In characterizing a cause of action, Utah courts look to the nature of the action and not the pleading labels chosen." *Records v. Briggs,* 887 P.2d 864, 868 (Utah Ct.App.1994); *see also Jensen v. Sawyers,* 2005 UT 81, ¶ 34, 130 P.3d 325 ("[W]e pay little heed to the labels placed on a particular claim, favoring instead an evaluation based on the essence and substance of the claim.").

¶ 13 Besides their request for an accounting, Plaintiffs listed four other causes of action in their original complaint. The substance of all these claims, however, was to ascertain whether Plaintiffs had been underpaid. Accounting is defined simply as "[a] legal action to compel a defendant to account for and pay over money owed to the plaintiff but held by the defendant." *Black's Law Dictionary* 19 (7th ed.1999). Although Plaintiffs use pleading labels for legal causes of action, the substance of each of those so-called legal claims was that MegaDyne failed to pay money owed to Plaintiffs, that it had unjustly retained funds to which it was not entitled, and that it did not disclose the accurate number of products coated and sold to avoid paying the full amount of money owed. The trial court therefore did not err in its conclusion that Plaintiffs' case was, in essence, for an accounting.

¶ 14 Nevertheless, it remains that "an action for an accounting may be legal or equitable[ ] depending upon the facts set out in the pleadings." *Green v. Palfreyman,* 109 Utah 291, 166 P.2d 215, 219 (1946). "The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is . . . the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 478, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). However, "[t]he equitable remedy of accounting may lie to adjust mutual accounts, or one-sided accounts which are complicated, or which, in addition to being mutual or complicated, require relief, by way of discovery, for their settlement." 1 Am.Jur.2d *Accounts & Accounting* § 56 (2005) (footnotes omitted); *accord Dairy Queen,* 369 U.S. at 478, 82 S.Ct. 894 (acknowledging that an equitable accounting may be maintained where "the accounts between the parties are of such a complicated nature that only a court of equity can satisfactorily unravel them" (internal quotation marks omitted)). Notably, the Utah Supreme Court has previously held that where a "plaintiff alleges that the defendant received all moneys earned under their agreement, kept the accounts, made all disbursements, and that the amount of receipts, disbursements and profits are within the knowledge of defendant and are unknown to plaintiff[,][t]his states a case for equitable jurisdiction." *Green,* 166 P.2d at 219.

¶ 15 We see no abuse of discretion in the trial court's determination that Plaintiffs' accounting claim here sounded in equity. Plaintiffs themselves cited the complexity of the case as justification for appointing a special master. Plaintiffs repeatedly asserted that MegaDyne alone had knowledge of the actual number of products coated and coated products sold and that MegaDyne had exclu-

sive control of documents proving such numbers.[5]

¶ 16 Furthermore, even if Plaintiffs' claims could be characterized as sounding in law instead of equity, Plaintiffs appear to have waived their right to a jury trial for such legal claims. "Generally, a party who does not object to a bench trial setting waives the right to a trial by jury." *Aspenwood, LLC v. C.A.T., LLC*, 2003 UT App 28, ¶ 38, 73 P.3d 947. Thus, where a party has "notice that [a] trial [is] set before the bench ... [and the party] fail[s] to object until the eve of trial," the party has waived its original demand for a jury trial. *Id.* ¶ 42. *See generally* Utah Code Ann. § 78B–5–101 (2008) (stating that "[i]n actions ... for money claimed due upon contract or as damages for breach of contract ..., an issue of fact may be tried by a jury, unless a jury trial is waived or a reference is ordered").

¶ 17 Although Plaintiffs made a jury demand along with their initial complaint, they subsequently moved the court for the appointment of a special master. In this motion, Plaintiffs indicated that after a special master determined the amounts of products coated and the number of coated products sold, *"the Court* will be able to easily determine the amount of compensation owed by [MegaDyne] to Plaintiffs." (Emphasis added.) After MegaDyne consented to the appointment of a special master, *Plaintiffs' counsel* prepared the Order of Reference for the trial court's signature. Subsequent to that signature, MegaDyne's and Plaintiffs' counsel "stipulate[d] to and approve[d] the entry of [the] Order of Reference."

¶ 18 The Order of Reference did not mention a jury trial. Rather, the Order of Reference tracked language from rule 53(e)(2) of the Utah Rules of Civil Procedure-the rule governing the procedure for and content of a special master's report in *non-jury actions*. The Order of Reference stated the following: (1) "[e]ach party shall have ten (10) days after receipt of the [special master's] report to submit objections"; (2) "[a]pplication to the Court for action upon the report and upon objections to the report shall be by

motion and upon notice as described in [r]ule 6(d) ... [of the] Utah Rules of Civil Procedure"; and (3) "[t]he Court, after hearing upon any objections, may adopt the report or may modify or reject the report in whole or in part or may receive further evidence through hearings or trial or may recommit the report to the master with instructions." This mirrors the language of rule 53(e)(2), which states:

> In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous. Within [ten] days after being served with notice of the filing of the report any party may serve written objections thereto upon the other parties. Application to the court for action upon the report and upon objections thereto shall be by motion and upon notice as prescribed in [r]ule 6(d). The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions.

Utah R. Civ. P. 53(e)(2).

¶ 19 In light of the language that Plaintiffs themselves inserted in the Order of Reference, Plaintiffs waived any right they may have had to a jury trial. Further, Plaintiffs did not attempt to claim a right to a jury trial until a year and a half had passed and the special master's final report had been submitted. Such delay also indicates a waiver of whatever right to a jury trial Plaintiffs may have originally held. *See Aspenwood*, 2003 UT App 28, ¶ 40 ("[A]ppellant's failure to object to the 'order for almost four months provided additional support for the district court's conclusion that there had been a waiver of the jury trial.'" (quoting *Sewell v. Jefferson County Fiscal Court*, 863 F.2d 461, 465 (6th Cir.1988))).

## II. Objections to the Special Master's Report

¶ 20 Plaintiffs next contend that the trial court erroneously overruled their objections to the proceedings before the special master and that it should sustain their substantive

---

5. Indeed, at the hearing on MegaDyne's motion to strike Plaintiffs' jury demand, Plaintiffs conceded that their accounting claim was equitable, rather than legal, in nature.

objections to the special master's final report. Rule 53 of the Utah Rules of Civil Procedure governs the proceedings associated with special masters. *See* Utah R. Civ. P. 53. Pursuant to rule 53, "[t]he order of reference to [a] master may specify or limit his powers and may direct him to report only upon particular issues." *Id.* R. 53(c). The master "has and shall exercise the power to regulate all proceedings ... and take all measures necessary or proper for the efficient performance of his duties under the order," "[s]ubject to the specifications and limitations stated in the order." *Id.* Once a reference to a special master is made, "the master shall forthwith set a time and place for the first meeting of the parties or their attorneys to be held within [twenty] days after the date of the order of reference." *Id.* R. 53(d)(1). In particular, "[w]hen matters of accounting are in issue before the master, he may prescribe the form in which the accounts shall be submitted." *Id.* R. 53(d)(3). In all of this, "the order of reference is at once the chart and limitation of the master's authority." *Plumb v. State*, 809 P.2d 734, 742 (Utah 1990) (internal quotation marks omitted).

¶ 21 Plaintiffs objected to six aspects of the special master's conduct during the proceedings: (1) failure to have a work plan; (2) failure to comply with deadlines; (3) failure to formally request production of documents under rule 34 of the Utah Rules of Civil Procedure; (4) improper ex parte communication with MegaDyne; (5) failure to submit evidence or testimony of documents relied upon in reaching the findings in the report; and (6) unauthorized calculation of money owed to Plaintiffs. Plaintiffs essentially argue that the proceedings before the special master were so flawed as to invalidate his report and, in turn, any court order based upon that report.

¶ 22 With regard to Plaintiffs' first two objections, we see no error in the trial court's ruling. The record reflects that the special master formed a work plan after his meeting with Plaintiffs and MegaDyne but that he chose not to disclose the entirety of it to prevent his methodology from affecting the parties' actions during the course of the litigation. The special master does not

appear to have violated any deadlines for submission of his final report given that the Order of Reference only required the special master to report his status after sixty days and to inform the parties of the date he expected the report to be completed. Given the open-ended nature of this deadline, it was not improper for the court to adjust exact deadlines as the case progressed. Even if the special master were late in complying with the deadline for conducting an initial meeting and giving an initial status report, Plaintiffs have failed to show the harm in that tardiness.

¶ 23 Furthermore, while the Order of Reference permitted the special master to use discovery tools, such as those contained in rule 34 of the Utah Rules of Civil Procedure, it did not require that he do so. The record reflects that the only ex parte contacts between the special master and MegaDyne related to the location and retrieval of documents, rather than to any substantive issues affecting the case. The record also reflects that the special master attached documents and evidence upon which he relied as exhibits to his preliminary report. The special master also concluded his final report with a list of those exhibits that again clearly identified the nine categories of documents and evidence, as well as specific documents within those categories, upon which his final report was based.

¶ 24 As to the last objection, even if the special master exceeded the scope of the referral, any error was harmless. The Order of Reference directed the special master to "take evidence on, identify, and prepare a report to the Court of his findings as to[ ] the amount of [MegaDyne]'s products coated and the amount of [MegaDyne]'s coated products sold under the Agreements." However, the Order of Reference described the "Referred Issues" somewhat more broadly: "The issues *relating to* the amount of ... [MegaDyne]'s products coated and [MegaDyne]'s coated products sold under the Agreements ... are hereby referred to the master." (Emphasis added.) Even if taken at its most narrow reading—that the special master was only to determine numbers of coated and sold products—the special master's calculation of the

money due was harmless given that such calculation was a matter of multiplying the number of products coated and coated products sold by the undisputed monetary figures in the parties' agreements.

¶ 25 Plaintiffs' objections to the substance of the special master's report, on the other hand, are not ripe for appellate review. "Ripeness occurs when a conflict over the application of a legal provision [has] sharpened into an actual or imminent clash of legal rights and obligations between the parties thereto." *Board of Trs. v. Keystone Conversions, LLC*, 2004 UT 84, ¶ 32, 103 P.3d 686 (alteration in original) (internal quotation marks omitted). In other words, an issue is not ripe until it has "matured to the extent that we can know with certainty the facts and law which shape its final outcome." *Pett v. Autoliv ASP, Inc.*, 2005 UT 2, ¶ 5, 106 P.3d 705.

¶ 26 The record clearly shows that the trial court has not yet ruled on Plaintiffs' substantive objections to the special master's report. The trial court granted Plaintiffs' request for an evidentiary hearing to consider those objections prior to the bench trial, but it has not yet held the hearing due to the filing of this interlocutory appeal. We therefore decline to address Plaintiffs' arguments regarding their substantive objections given that any ruling on the issue "would be little more than an advisory opinion." *See id.*

### III.   Motion to Amend Complaint

¶ 27 Finally, Plaintiffs argue that the trial court erred in denying their motion for leave to file an amended complaint. Rule 15(a) of the Utah Rules of Civil Procedure provides that once a responsive pleading has been filed and twenty days have passed, "a party may amend his pleading only by leave of court or by written consent of the adverse party." Utah R. Civ. P. 15(a). "[I]n analyzing the grant or denial of a motion to amend, Utah courts have focused on three factors: the timeliness of the motion; the justification given by the movant for the delay; and the resulting prejudice to the responding party." *Kelly v. Hard Money Funding, Inc.*, 2004 UT App 44, ¶ 26, 87 P.3d 734 (internal quotation marks omitted). "[O]ther factors that

the trial court might deem relevant in a particular case" may be considered "alongside" the three specifically enumerated factors. *Id.* ¶ 40 (emphasis omitted). Notwithstanding the "multi-factored" approach to this issue, "the circumstances of a particular case may be such that a court's ruling on a motion to amend can be predicated on only one or two of the particular factors." *Id.* ¶ 42.

¶ 28 While no bright-line rule has been established "regarding how far into the litigation process a motion to amend must be filed in order to be deemed untimely," "two principles have emerged." *Id.* ¶ 28. "First, motions to amend are typically deemed untimely when they are filed in the advanced procedural stages of the litigation process, such as after the completion of discovery, on the eve of a scheduled trial date, or after an order of dismissal has already been entered." *Id.* ¶ 29. "Second, regardless of the procedural posture of the case, motions to amend have typically been deemed untimely when they were filed several years into the litigation." *Id.* ¶ 30. The reasoning behind this principle is that "the ongoing passage of time makes it increasingly difficult for the non-moving party to effectively respond to the new allegations or claims." *Id.* In particular, "[p]arties in such circumstances are often hindered by witnesses who have since moved or died, by their shaky memories and recollections, or by documents which have since been lost or destroyed." *Id.* Furthermore, "[t]rial courts are in a much better position than appellate courts to make such case-specific determinations as to whether too much time has passed to fairly allow an amendment." *Id.* ¶ 41.

¶ 29 Here, the trial court cited the passage of an entire decade since the filing of the original complaint as the reason for its denial of Plaintiffs' motion to amend. Plaintiffs acknowledge the above-mentioned precedent regarding the passage of long periods of time, but they argue that their case is atypical and justifies an exception from these general principles. They cite a relationship between the claims already at issue and the claims they wish to add as well as the policy of judicial economy and, more generally, the

need for justice. We see nothing particularly atypical about Plaintiffs' circumstances. Giving due deference to the trial court's advantageous position in evaluating individual circumstances, we conclude that the trial court did not abuse its discretion in denying Plaintiffs' motion to amend where the parties were ten years into the litigation.

## CONCLUSION

¶ 30 The trial court did not abuse its discretion in determining that Plaintiffs' claim for accounting sounded in equity, and it therefore did not err in striking Plaintiffs' jury demand. The trial court did not err in overruling Plaintiffs' objections to the procedures used by the special master given that the special master's actions were either not improper or constituted harmless error. We decline to review, however, Plaintiffs' objections to the substance of the special master's report given that the trial court has not yet ruled on those objections. Finally, we conclude that the trial court did not abuse its discretion in denying Plaintiffs' request for leave to amend their complaint, especially in light of the length of time that had passed since the initiation of the litigation.

¶ 31 Accordingly, we affirm.

¶ 32 WE CONCUR: GREGORY K. ORME and JAMES Z. DAVIS, Judges.